UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:20-cv-21001

SECURITIES AND EXCHANGE
COMMISSION,

                              **Plaintiff,**

v.

BROOK CHURCH-KOEGEL,
DAVID H. GOLDMAN,
and NICOLE J. WALKER,

                              **Defendants.**

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission") alleges:

**I.    INTRODUCTION**

1. From at least June 2014 through December 2017, Brook Church-Koegel, David H. Goldman, and Nicole J. Walker (collectively, the "Defendants") were among the top revenue-producing internal sales persons for Woodbridge Group of Companies, LLC, d/b/a Woodbridge Wealth ("Woodbridge"). Woodbridge and its then owner and President, Robert H. Shapiro, operated Woodbridge as a massive Ponzi scheme, which, from July 2012 through December 2017, raised at least $1.22 billion from more than 8,400 unsuspecting investors nationwide through fraudulent unregistered securities offerings.

2. In their internal sales agent positions, the Defendants personally solicited and sold Woodbridge securities in unregistered transactions to investors, many of whom were elderly retirees who invested their retirement savings as a result of the Defendants' sales and marketing tactics. Church-Koegel and Goldman also served as "team leaders," and in that role, were

responsible for coordinating and assisting the wide-ranging sales efforts of many internal sales agents who sold Woodbridge securities. Additionally, each of the Defendants coordinated and assisted external sales agents in their efforts to sell Woodbridge's securities, including regularly speaking with them over the telephone and sometimes joining them in calls with investors to answer questions about Woodbridge's securities.

3. The Defendants pitched Woodbridge's securities to the general public via email, telephone, at in-person meetings, and using other instruments of interstate commerce. The Defendants provided investors with Woodbridge's sales and marketing materials, touting Woodbridge's securities as "safer" and "conservative." The Ponzi scheme collapsed on December 4, 2017, when Shapiro caused Woodbridge and its many related companies to file for bankruptcy. Once Woodbridge filed for bankruptcy, investors stopped receiving their monthly interest payments and have not received a return of their investment principal.

4. The Defendants, acting as unregistered brokers, together were responsible for raising through their own efforts and the efforts of external sales agents that they assisted, approximately $444 million between June 2014 and December 2017, from thousands of investors in more than 40 states, from the offer and sale of Woodbridge's securities in unregistered transactions. For their efforts during this time period, together, Church-Koegel, Goldman, and Walker received at least $2.75 million in transaction-based compensation, in addition to their salaries. At all relevant times, the Defendants held no securities licenses, were not registered with the Commission, and were not associated with registered broker-dealers. Further, Woodbridge's securities were not registered with the Commission, nor did they qualify for an exemption from registration. The Defendants thus were not permitted to sell Woodbridge's securities.

5. As a result of the conduct alleged in this Complaint, Defendants violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)]; and 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)].

6. Unless enjoined, the Defendants are reasonably likely to continue to violate the federal securities laws. The Commission seeks permanent injunctions, disgorgement of ill-gotten gains plus prejudgment interest, and civil money penalties against each of the Defendants.

## II.   DEFENDANTS

7. **Church-Koegel** is a resident of Marina Del Ray, California. From at least December 2013 until January 2018, Woodbridge employed Church-Koegel as a senior consultant. From approximately June 2014 until December 2017, Church-Koegel personally solicited and sold Woodbridge securities in unregistered transactions to numerous investors and coordinated and assisted the sales efforts of many internal and external sales agents who sold Woodbridge securities in numerous states. Woodbridge paid Church-Koegel commissions in his name and through his wholly-owned alter ego company, Whyte & Brown, Inc., an entity that now has been administratively dissolved. Church-Koegel has never been registered as or associated with a Commission registered broker-dealer or investment adviser.

8. **Goldman** is a resident of Chatsworth, California. From at least June 2012 to January 2018, Woodbridge employed Goldman as a senior consultant. From approximately June 2014 until December 2017, Goldman personally solicited and sold Woodbridge securities in unregistered transactions to investors and coordinated and assisted with the sales efforts of many internal and external agents who sold Woodbridge securities in numerous states. Woodbridge paid Goldman commissions in his name and through his alter ego company, DG Marketing, Inc., a

California entity. Goldman has never been registered as or associated with a Commission registered broker-dealer or investment adviser.

9. **Walker** is a resident of Marina Del Ray, California. From at least December 2013 to December 2017, Woodbridge employed Walker as a senior consultant. Beginning in approximately June 2014, Walker personally solicited and sold Woodbridge securities in unregistered transactions to investors and coordinated and assisted with the sales efforts of many external agents who sold Woodbridge securities in numerous states. Woodbridge paid Walker commissions in her name and through her wholly-owned alter ego company, Valor Enterprises, Inc., an entity that now has been administratively dissolved. Walker has never been registered as or associated with a Commission registered broker-dealer or investment adviser.

### III.   OTHER RELEVANT ENTITY AND INDIVIDUAL

10. **Woodbridge** is a Sherman Oaks, California-based financial company, not registered with the Commission in any capacity, with no publicly traded stock. Formed in 2012, Woodbridge had approximately 130 employees in offices in six states. On December 4, 2017, Woodbridge filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware. *In re Woodbridge Group of Companies LLC, et al.,* Case No. 17-12560 (jointly administered) (Bankr. D. Del. Dec. 4, 2017).

11. **Shapiro** was a resident of Sherman Oaks, California at all material times. Shapiro was Woodbridge's former owner, President, and CEO and maintained operational control over Woodbridge and its related companies, until those companies filed for bankruptcy. On December 20, 2017, the Commission brought an emergency action against Shapiro, Woodbridge, and others seeking an asset freeze, along with injunctive and other relief. *SEC v. Shapiro*, et al., Case No. 1:17-cv-24624 (MGC) (S.D. Fla.). On December 27, 2018, Final Judgment, by consent, was

entered against Shapiro, enjoining him from violating the federal securities laws as charged, ordering him to pay more than $20 million in disgorgement with prejudgment interest, and imposing a $100 million civil penalty. On August 7, 2019, Shapiro pleaded guilty to conspiracy to commit mail and wire fraud in connection with the Woodbridge Ponzi scheme, as well as tax evasion. On October 15, 2019, he was sentenced to 25 years in prison. *United States v. Shapiro*, No. 1:19-cr-20178 (S.D. Fla.). Shapiro currently is in prison. Shapiro is not, and has never been, registered with the Commission, FINRA, or any state securities regulator.

## IV.   JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

13. This Court has personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. §1391(b)(2).

14. Defendants transacted business in this judicial district while participating in the offer and sale of Woodbridge's securities. Among other things, Defendants each solicited and sold Woodbridge securities, and coordinated with and assisted external sales agents located within this district in selling Woodbridge securities, to investors residing in this district. More specifically, Church-Koegel coordinated with and assisted at least four external sales agents located in this district in their sale of at least $10.5 million of Woodbridge's securities and further directly solicited and sold at least $1.8 million to eight investors located in this district. Goldman coordinated with and assisted at least four external sales agents located in this district in their sale of at least $59 million of Woodbridge's securities and further directly solicited and sold at least

$960,000 to nine investors located in this district. Walker coordinated with and assisted at least three external sales agents located in this district in their sale of at least $2.5 million of Woodbridge's securities and further directly solicited and sold at least $100,000 to two investors located in this district. Additionally, in 2016 and 2017, Church-Koegel met with external sales agents and investors on at least three occasions in Palm City, Florida; West Palm Beach, Florida; and Boca Raton, Florida. On at least one occasion Church-Koegel gave a presentation showing Woodbridge properties on Google Earth to a group of potential investors at a restaurant in Palm City, Florida. In December 2016, Goldman traveled to Deerfield Beach, Florida, to meet with some of the highest revenue-producing external sales agents.

15. In connection with the conduct alleged in the Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

V.   **FACTS**

   A.   **Woodbridge's Background and Securities**

16. Beginning in July 2012 through at least December 4, 2017, Shapiro and Woodbridge orchestrated a massive Ponzi scheme raising in excess of $1.22 billion from the sale of securities to over 8,400 investors nationwide. Shapiro promised investors they would be repaid from the high interest rates Woodbridge was earning on loans it purportedly was making to third-party commercial property owners ("Third-Party Borrowers"). However, nearly all the purported Third-Party Borrowers were actually limited liability shell companies owned and controlled by Shapiro ("Shapiro's LLCs"), which had no revenue, no bank accounts, and never paid any interest

under the loans. Together, the Defendants are responsible for raising or coordinating and assisting external sales agents in raising approximately $444 million from thousands of investors.

17. Woodbridge sold investors two primary types of securities: (1) twelve-to-eighteen month term promissory notes bearing 5%-8% annual interest that Woodbridge described as First Position Commercial Mortgages ("FPCM Notes" and "FPCM Investors"), which were issued by one of Woodbridge's affiliated fund entities; and (2) seven different private placement fund offerings with five-year terms: (a) Woodbridge Mortgage Investment Fund 1, LLC; (b) Woodbridge Mortgage Investment Fund 2, LLC; (c) Woodbridge Mortgage Investment Fund 3, LLC; (d) Woodbridge Mortgage Investment Fund 3A, LLC; (e) Woodbridge Mortgage Investment Fund 4, LLC; (f) Woodbridge Commercial Bridge Loan Fund 1, LLC; and (g) Woodbridge Commercial Bridge Loan Fund 2, LLC (collectively, the "Fund Offerings" and "Fund Investors").

### 1. FPCM Notes

18. Woodbridge represented that a FPCM Note was a "simple, safer and more secured opportunity for individuals to achieve their financial objectives." The purported revenue source enabling Woodbridge to make the payments to FPCM Investors was the interest Woodbridge would be receiving from mainly one-year loans to supposed Third-Party Borrowers. Woodbridge told investors that these Third-Party Borrowers were paying Woodbridge 11-15% annual interest for "hard money," short-term financing. Woodbridge would secure the debt through a mortgage on the Third-Party Borrowers' real estate. For example, Woodbridge wrote in marketing materials, "Woodbridge receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your [FPCM] documents."

19. In truth and in fact, however, Woodbridge created false promissory notes evidencing these payments from Third-Party Borrowers and incorporated these documents by reference in the promissory notes provided to each investor.

20. The FPCM Investors invested their funds in a common enterprise with the expectation of earning the promised returns based on the efforts of others, while maintaining what they were told would be a secured interest in a parcel of real estate.

21. The profitability of the FPCM investments was derived solely from the efforts of Shapiro and Woodbridge, and the investments were in a common enterprise. Once investors provided their funds to Woodbridge, their funds were commingled with other investors' funds and used by Woodbridge for general business purposes. Investors had no control over how Shapiro and Woodbridge used their money. Because Woodbridge was a Ponzi scheme, its ability to pay returns depended upon its continued ability to raise funds from new investors and convince existing investors to rollover their investments. Woodbridge informed investors that it conducted due diligence, including title search and appraisal, on the commercial property and supposed Third-Party Borrower. The investors played little or no role in selecting which properties would purportedly secure their investments. The Defendants also provided investors with marketing materials prepared by Woodbridge that reassured investors, telling them not to worry about borrowers failing to make their loan payments because Woodbridge would continue to pay investors their interest payments.

    2.    <u>Fund Offerings</u>

22. At the same time it was soliciting FPCM Investors, Woodbridge also offered to sell investors the Fund Offerings through its affiliated fund entities, pursuant to purported exemptions from registration under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively

seeking to raise at least $435 million from investors. In the Regulation D filings, Woodbridge described the Fund Offerings as "equity" securities.

23. Woodbridge attempted to avoid registration of the Fund Offerings with the Commission, purportedly limited each of the Fund Offerings to accredited investors with a $50,000 minimum subscription, and provided for a five-year term with a 6% to 10% aggregate annual return paid monthly to Fund Investors and a 2% "accrued preferred dividend" to be paid at the end of the five-year term and a share of "profits." Neither Woodbridge nor the Defendants ensured that only accredited investors purchased the Fund Offerings (or the FPCMs).

24. In the offering memoranda for the Fund Offerings, Woodbridge represented to Fund Investors that their funds would be used for real estate acquisitions and investments, notably including Woodbridge's FPCMs. The Fund Offerings, in effect, were investments into pooled FPCMs. Many of these pools contained 40 or more investors.

25. Investors in the Fund Offerings invested in a common enterprise with the expectation of profit based on the efforts of others. The allegations of paragraphs 20 and 21 of this Complaint are applicable to the Fund Offerings as well.

26. The FPCM Notes and the Fund Offerings are securities within the meaning of Securities Act § 2(a)(1), 15 U.S.C. § 77b(a)(1), and Exchange Act § 3(a)(10), 15 U.S.C. § 78c(a)(10). Investors were unquestionably motivated by the high rate of returns that Woodbridge offered, and investors viewed these as passive investments generating safe returns. Woodbridge sold the FPCM Notes to a broad segment of the public (at least 8,400 investors) through general solicitations, and there were no risk-reducing factors indicating the FPCM Notes were not securities. Neither the FPCM Notes nor the Fund Offerings were registered with the Commission, and there was no applicable exemption from registration.

### B. Woodbridge's Misrepresentations

27. Woodbridge's claim that it was using investors' funds to make high interest rate loans to Third-Party Borrowers was a lie. In reality, Woodbridge's business model was a sham. Investors' funds were used to purchase, in the name of Shapiro's LLCs, almost 200 residential and commercial properties, primarily in Los Angeles, California and Aspen, Colorado. Thus, nearly all the "Third-Party Borrowers" were Shapiro's LLCs, which had no source of income, no bank accounts, and never made any loan payments to Woodbridge, all facts Woodbridge and Shapiro concealed from investors.

28. Instead of accurately identifying Shapiro's LLCs as the true borrowers, Woodbridge's sales agents, including Church-Koegel, Goldman, and Walker, only infrequently made passing mention that the underlying properties were sometimes owned by "Woodbridge affiliates."

29. Because Shapiro's LLCs were not making any of the promised interest payments and Woodbridge's other revenue was minimal, Woodbridge sought to convince FPCM Investors to rollover their investment into a new note at the end of the term, so as to avoid having to come up with the cash to repay the principal. In order to pay the returns to FPCM and Fund Investors, redemptions to FPCM Investors who did not rollover their notes, and commissions to sales agents, Woodbridge had to raise and use new investor funds, in classic Ponzi-scheme fashion.

30. Finally, on December 1, 2017, after amassing more than $1.22 billion of investor money, with more than $961 million in principal still due to investors, Woodbridge and Shapiro missed their first interest payments to investors after purportedly ceasing their fundraising activities. Without the infusion of new investor funds, just days later, on December 4, 2017, Shapiro caused most of his companies to be placed in Chapter 11 Bankruptcy.

31. In the Chapter 11 Bankruptcy, Woodbridge, now under the control of independent management, took the position that the FPCM Investors do not have secured interests in the properties underlying their investments because they were required to perfect their interests pursuant to the requirements of the Uniform Commercial Code, which virtually none of the investors did.

### C. The Defendants Offered and Sold Securities in Unregistered Transactions to Retail Investors

32. From approximately June 2014 until December 2017, the Defendants personally offered and sold Woodbridge securities in unregistered transactions to investors in multiple states, many of whom were elderly retirees, who invested through their Individual Retirement Account (IRA) accounts and were neither accredited nor sophisticated. Neither Woodbridge nor the Defendants took steps to ensure the investors were accredited.

33. From approximately June 2014 to December 2017, each Defendant offered or sold securities to investors in more than 40 states with Church-Koegel selling to or assisting external sales agents in their sale to approximately 1,600 investors, Goldman selling to or assisting external sales agents in their sale to approximately 2,800 investors, and Walker selling to or assisting external sales agents in their sale to approximately 1,000 investors. Further, the Defendants actively solicited the general public to invest in the FPCMs and Fund Offerings, and they also touted Woodbridge to financial planners and insurance agents so they could refer investors to Woodbridge.

34. The Defendants solicited investors directly through in-person meetings, emails, and telephone calls, and other forms of communication. In these communications, the Defendants extolled the merits of Woodbridge securities to the investors, including the high interest rates, and reassured them about the safety of investing with Woodbridge, describing Woodbridge FPCM

Notes as "safer," "conservative," and "secured" by underlying collateral property. In addition, the Defendants sometimes referred investors to Woodbridge's website or circulated marketing materials containing false and misleading statements about Woodbridge to investors. For example, marketing materials stated that Woodbridge delivers monthly payments to investors from the mortgage payments it receives from borrowers, when in reality, nearly all the borrowers were Shapiro's LLCs and not making payments. As such, most payments delivered to investors were from new investors' funds, not mortgage payments from borrowers.

35. If an investor decided to invest, the Defendants filled out a Woodbridge online form, identifying the customer and selecting the property the customer wanted as collateral. Woodbridge's legal department then drafted a loan agreement and a promissory note, and Woodbridge's processing or legal department would send the documents with instructions to the Defendants. The investor signed these documents, provided a check for their principal investment, and the Defendants made sure the package would be processed timely. The investor then received monthly payments directly from Woodbridge.

36. As early as May 2015, various states began issuing cease-and-desist orders against Woodbridge for selling securities in unregistered transactions. Not only did the Defendants continue to sell Woodbridge securities, but the Defendants did not bring this fact to investors' attention. In at least one instance, when an investor raised two state regulatory actions against Woodbridge to Walker, she responded that they were "technicalities" and that Woodbridge had not done anything illegal.

37. For their work as internal sales agents, each Defendant received a salary. Defendants also received commissions for sales of FPCM Notes and Fund Offerings. Woodbridge

paid the Defendants a 1% commission for the sales of FPCM Notes, and a commission ranging from 0.5% to 5%, depending on various factors, for the sales of Fund Offerings.

38. Each of the Defendants coordinated and assisted numerous external sales agents in their sales of Woodbridge's securities. Once Church-Koegel and Goldman were appointed "team leaders," they also coordinated and assisted the sales efforts of many internal sales agents, who sold Woodbridge securities. Church-Koegel and Goldman routinely took calls from these sales agents, sometimes with investors participating in the calls, to answer questions about Woodbridge investments. Through this work, Church-Koegel and Goldman received an extra half percent commission for the sales of the agents they assisted.

39. As a result of these efforts, from approximately June 2014 to December 2017, the Defendants together raised at least $444 million from thousands of investors in more than 40 states, from the offer and sale of Woodbridge's securities in unregistered transactions. Despite not being registered with the Commission in any capacity, the Defendants reaped significant transaction-based compensation, in addition to their salaries, for selling the Woodbridge securities. From approximately June 2014 to December 2017, Church-Koegel and Goldman each received more than $1 million in commissions, and Walker received more than $750,000 in commissions. Woodbridge paid the Defendants in their names and through their wholly-owned alter ego companies, which then made distributions to the Defendants.

40. At no point were Church-Koegel, Goldman, or Walker registered as or associated with Commission registered-broker dealers or investment advisers. Further, the FPCM Notes and Fund offerings were not registered with the Commission, and there was no applicable exemption from registration. The Defendants thus were not permitted to sell Woodbridge's securities.

## VI.    CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF SECTIONS 5(a) AND 5(c) OF THE SECURITIES ACT
### [15 U.S.C. §§ 77e(a) and 77e(c)]

41.    The Commission repeats and realleges paragraphs 1 through 40 of its Complaint.

42.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities offered and sold by the Defendants subject to this count as described in this Complaint, and no exemption from registration existed with respect to these securities.

43.    From approximately June 2014 through at least December 4, 2017, the Defendants, Church-Koegel, Goldman, and Walker, directly and indirectly:

>    (a)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;
>
>    (b)    carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or
>
>    (c)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

44.    By reason of the foregoing, the Defendants violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

# COUNT II

## VIOLATIONS OF SECTION 15(a)(1) OF THE EXCHANGE ACT
[15 U.S.C. § 78o(a)(1)]

45. The Commission repeats and realleges Paragraphs 1 through 40 of this Complaint.

46. From approximately June 2014 through at least December 4, 2017, the Defendants, Church-Koegel, Goldman, and Walker, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity registered with the Commission as a broker-dealer in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b).

47. By reason of the foregoing, the Defendants, directly and indirectly have violated, and unless enjoined, are reasonably likely to continue to violate, Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

A.   **Permanent Injunctive Relief**

Issue a Permanent Injunction enjoining the Defendants from directly or indirectly violating Sections 5(a) and 5(c) of the Securities Act and Section 15(a)(1) of the Exchange Act.

### B. Disgorgement and Prejudgment Interest

Issue an Order directing the Defendants to disgorge all ill-gotten gains or proceeds received within the applicable statute of limitations, with prejudgment interest thereon, resulting from the acts and/or courses of conduct complained of herein.

### C. Civil Money Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

### D. Further Relief

Grant such other and further relief as may be necessary and appropriate.

### E. Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action, in accordance with the principles of equity and the Federal Rules of Civil Procedure, in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VII. DEMAND FOR JURY TRIAL

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated: March 5, 2020.

                                                          Respectfully submitted,

By:    /s/ *Christine Nestor & Stephanie N. Moot*
           **Christine Nestor & Stephanie N. Moot**
           Senior Trial Counsel & Trial Counsel
           nestorc@sec.gov; moots@sec.gov
           FL Bar No. 597211; FL Bar No. 30377
           Telephone: (305) 982-6367; (305) 982-6313

                                         Attorneys for Plaintiff
                                         **Securities and Exchange Commission**
                                         801 Brickell Avenue, Suite 1950
                                         Miami, Florida 33131
                                         Telephone: (305) 982-6300
                                         Facsimile: (305) 516-4154

Of counsel:

Michelle Bosworth, Counsel
Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300